**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

---

**DAVID FRAKER**,

     Plaintiff,                 Case No.: 1:18-cv-01444

v.                               **HON. PAUL L. MALONEY**

**CITY OF GRAND RAPIDS**,
a Michigan Municipal Corporation,

     Defendant.

_____/

**DAVID FRAKER,** *in pro per*
3032 Bird Ave., NE
Grand Rapids, MI  49525
(616) 644-3038
davidbfraker@gmail.com

**ELIZABETH J. FOSSEL (P41430)**
Director of Civil Litigation
**TOBY KOENIG (P72367)**
Assistant City Attorney
Attorneys for Defendant City of Grand Rapids
300 Monroe Ave. NW, Ste. 620
Grand Rapids, MI 49503
(616) 456-3181
(616) 456-4569 FAX
efossel@grcity.us
tkoenig@grcity.us

_____/

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(a)**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ 2

**I.   BACKGROUND FACTS** ...................................................................................... 1

**II.  LAW & ARGUMENT** ............................................................................................ 7
    **A. Legal Standards – Motion for Summary Judgement** ................................... 7
    **B.  Analysis of Plaintiff's Discrimination and Failure to Accommodate Claims** .......... 7
    **1.   Overview of the ADA** .......................................................................... 7
    **2.   Overview of the PWDCRA** ................................................................. 9
    **3.   Plaintiff is not a "qualified individual" as he could not perform the essential functions of the position of Tree Trimmer I, with or without accommodation.** .......... 10
        a.   Essential Functions. ............................................................................. 10
        b.   Plaintiff could not perform the essential functions of Tree Trimmer I. .......... 15
    **4. Plaintiff's Theories of Reasonable Accommodation are untenable** .......... 18
        a.   Plaintiff was not entitled to construct his own job. .......................... 18
        b.   Plaintiff's applications for promotion do not constitute a request for reasonable accommodations. ...... 20
        1.   Plaintiff was not eligible for a transfer into the ERT or Arborist position. .......... 20
        2.   Plaintiff failed to properly apply for Arborist portion. .......... 22
    **5  Medical leave together with supplementary compensation constituted a reasonable accommodation** 23
    **C. Analysis of Plaintiff's Retaliation Claims** ........................................... 25
    **1.   Retaliation under the ADA** ................................................................ 25
    a.   Rowena Patterson's refusal to allow Plaintiff's application for Arborist after the application window closed. .......... 27
    b.   Joe Sulak's call terminating Plaintiff's employment ................................ 28
    c.   The "bogus" performance evaluation ................................................... 29
    **2.   Retaliation Under the WDCA.** ........................................................... 30

## TABLE OF AUTHORITIES

### Cases

*Aldini v. Kroger Co. of Michigan,*
  628 Fed. Appx. 347, 352 (6th Cir. 2015) ................................................................ 26

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .............................. 7

*Ansonia Bd. Of Educ. v. Philbrook,*
  479 U.S. 60, 68-69; 107 S.Ct. 367; 93 L.Ed.2d 305 (1986) ................................. 25

*Ashton v. Tapco Intern. Corp.,*
  631 Fed. Appx. 292, 296 (6th Cir. 2015) ............................................... 15, 17, 18

*Back v. Nestle USA, Inc.,*
  694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson,* 477 U.S. at 251-52) ............ 7

*Bolden v Lowes Home Centers, LLC,*
  783 Fed. Appx. 589 (6th Cir. 2019) ..................................................................... 24

*Bratten v. SSI Servs., Inc.,*
  185 F.3d 625, 632-633 (6th Cir.1999) .................................................................. 18

*Cuddington v. United Health Servs.,*
  298 Mich.App 264, 275; 826 N.W.2d 519 (2012) ................................................. 30

*Doe v. Univ. of Maryland Medical Sys. Corp.,*
  50 F.3d 1261, 1264-1265 (4th Cir. 1995) ................................................................ 8

*E.E.O.C. v. Ford,*
  782 F.3d at 757 ................................................................................................. *passim*

*Griffith v. Wal-Mart Stores, Inc.,*
  135 F.3d 376, 380 (6th Cir. 1998) (emphasis added) ........................................... 17

*Gross v. FBL Fin. Servs., Inc.,*
  557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) .............................. 27

*Hankins v. The Gap, Inc.,*
  84 F.3d 797, 800-01 (6th Cir.1996) ...................................................................... 25

*Harris v. Metro. Gov't of Nashville & Davidson Cnty,*
  594 F.3d 476, 486 (6th Cir.2010), citation omitted ............................................. 26

*Jakubowski v. Christ Hosp., Inc.,*
  627 F.3d 195, 200 (6th Cir. 2010) .......................................................................... 7

*Kerns v Dura Mechanical Components, Inc.,*
  242 Mich. App. 1, 16; 618 N.W.2d 56, 64 (2000) ................................................ 19

*Linsay v. Yates,*
  578 F.3d 407, 418-19 (6th Cir. 2009) ................................................................... 29

*Peden v. City of Detroit,*
  470 Mich. 195, 204, 680 N.W.2d, 857 (2004) ............................................ 9, 13, 15

*Rorrer v. City of Stow,*
  743 F.3d 1025, 1039 (6th Cir. 2014) ..................................................................... 18

*Sniecinski v. Blue Cross & Blue Shield of Mich.,*
  469 Mich. 124, 140; 666 NW2d 186 (2003) ......................................................... 31

*St. Mary's Honor Ctr. V Hicks,*
  509 U.S. 502, 506-507, 113 SCt. 2742, 125 L.Ed.2d 407 (1993) ........................... 8

*Trout v. Electronic Data Systems Corp*.,
    151 Fed. Appx. 390, 399 (6th Cir. 2005) ................................................................. 19
*Tysinger v Police Dep't of Zanesville*,
    463 F.3d 569, 572 (6th Cir. 2006) ......................................................................... 7
*U.S. Airways v. Barnett*,
    535 U.S. 391, 394, 122 S.Ct. 1516, 152 L.ed.2d 589 (2002) ................................ 21
*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338, 362, 133 S.Ct 2517, 186 L.Ed.2d 503 (2013) ................................ 26
*West v. Gen. Motors Corp.,*
    469 Mich. 177, 186; 665 N.W.2d 468 (2003) ...................................................... 31

## Statutes

42 U.S.C. § 12111(8) ....................................................................................................... 10
42 U.S.C. §12111(8) ......................................................................................................... 9
42 U.S.C. §12111(8) and
    M.C.L 37.1103(1)(i) .............................................................................................. 10
42 U.S.C. §12112(a) ......................................................................................................... 8
M.C.L. 37.1103(l)(i) ....................................................................................................... 10
M.C.L. 418.301(11) ........................................................................................................ 26
MCL 37.1202(1)(a)-(e) ..................................................................................................... 9
The Americans with Disabilities Act (ADA), 42 U.S.C. §12101 ..................................... 8

## Rules

29 C.F.R § Pt. 16302(n). ................................................................................................. 18
29 C.F.R. § 1630.2 ......................................................................................................... 20
29 C.F.R. 1630.2(n)(1) ................................................................................................... 10
29 CFR 1630.2(n)(3) ...................................................................................................... 11

## I.   BACKGROUND FACTS

On January 23, 2017, Defendant City of Grand Rapids (City) hired Plaintiff, David Fraker, as a Tree Trimmer I. Complaint (ECF No. 1) ¶ 7.  The Tree Trimmer I job description requires that an employee be able to, among other things, prune, trim, and remove trees using specialized equipment and hand and power saws; remove split and damaged limbs and limbs on overhead powerlines; plant trees and remove stumps and roots; operate equipment in a safe manner; and perform manual labor including "lifting heavy objects." See, Tree Trimmer I Job Description, Exhibit 1.

During his first weeks on the job, Plaintiff experienced performance problems on the job site. These included failing to follow the lead worker's instructions, putting co-workers at risk by throwing brush from the aerial bucket, and performing a technique known as bore-cutting, which the City does not use. Affidavit of Floyd Calendar, Exhibit 2.  Dan Coy, the City Forester and Plaintiff's supervisor, verbally counselled Plaintiff against using this technique and directed him to follow his lead worker's instructions. Coy Affidavit, Exhibit 3.  Mr. Coy did not issue a written reprimand or written warning, believing that Plaintiff was still adapting to being part of a new team. *Id*.

On February 23, 2017, Plaintiff was injured on the job.  He was diagnosed with a fracture of his left small finger. See Deposition of David Fraker, Exhibit 4, p 14.  Following a consult with a hand surgeon, Plaintiff underwent a bone-pinning surgery.  *Id.*, p 15.  Plaintiff expected a full recovery to take approximately six weeks. *Id.,* 15. Plaintiff's doctors restricted him from "work requiring grasping, gripping, squeezing of the left hand."  See Exhibit 2 to the Affidavit of Craig Coulson, Exhibit 5 (Medical Restriction Summary) (February 24, 2017).   As a result, Plaintiff was put on medical leave and Plaintiff received worker's compensation and a wage supplement

amounting in virtually full pay.  See Affidavit of Craig Coulson, Exhibit 5 [1] and Affidavit of Mary Karsis, Exhibit 6.

Under the GREIU Collective Bargaining Agreement (CAB) and the City's Civil Service rules (CSR), a new hire is on probation during his first six months with the City and may be terminated at any point during that period. See CAB, Exhibit 7, Art. 12.2(b) and CSR, Exhibit 8, rule 406.1.  Because Plaintiff had been on the job less than a month and because, initially his recovery period was expected to be short, Plaintiff's supervisor, Dan Coy told Plaintiff that he would support "pausing" Plaintiff's probationary period. Affidavit of Dan Coy, Exhibit 3.  Mr. Coy specifically hoped to allow Plaintiff time to adjust his attitude as well as recover from his temporary injury. *Id*. Consequently, Coy made a request to Human Resources that the probation be paused. *Id*.  However, Human Resources did not act on the request, or make an agreement to that effect.  Affidavit of Ken Deering, Exhibit 9.[2]

On May 8, 2017, Plaintiff's doctor recommended a second surgical procedure (tenolysis) to clear suspected scar tissue from the tendon. Fraker Deposition, Exhibit 4, p 18.   Unfortunately, during the surgery, on May 25, 2017, doctors discovered that Plaintiff's tendon had ruptured, necessitating a tendon transplant rather than a simple tenolysis.  *Id*., pp 18-19.  Plaintiff's left hand was then completely immobilized for five weeks. *Id*., pp. 20-21; Medical Restriction Summary, Exhibit 2 to Coulson Affidavit, (Exhibit 5) (May 31, 2017 through July 5, 2017).

---

[1]   Exhibit 2 to Mr. Coulson's Affidavit--which contains a Summary of Medical records backed up by the records themselves—is currently subject to a Motion to Seal.  (ECF No. 49, Page ID. 141-142).

[2]   As Mr. Deering notes, employees on a promotional probation to a higher portion may be granted an extension of probation consistent with the City's Memorandum of Understanding with the GREIU.  Entrance level probationary employees, such as Plaintiff are not covered by the MOU. Deering Affidavit, Exhibit 9.

Although Plaintiff anticipated that his injury was still going to be temporary, he informed the City – through Parks Superintendent, Joe Sulak – that the "injury had been worse than originally recognized" and that "in the short term …I couldn't do anything with that hand but that thereafter it should recover again, as they anticipated the first time." *Id.,* at 24. Plaintiff told both Sulak and Coy that, after the May 25th surgery, it would be "two to three months" before he had full use of the hand. *Id.* at 24-25. In other words, his recovery period would now extend beyond the end of his original probation period in July.[3]

Although off with virtually full pay,[4] Plaintiff inquired as to whether he could return to work in various ways. For example, Plaintiff claimed that he brought up the ideas of doing "plant health" tasks in the form of spraying and injecting trees (Fraker Deposition, Exhibit 4, p 72, 104), serving as a traffic flagman *(Id.,* p 95), or training volunteers at a one-day tree planting event on Arbor Day. *Id.,* p 105-106. While he never requested a transfer to a specific position that he could do with his restrictions, he says that he did ask whether he could answer phones (*Id*., p 104-105) or input data into the GIS database. *Id.*, p 207. Plaintiff testified, that, each time he broached a return to work, he was told by his supervisor, Dan Coy, that Mr. Coy would inquire about his ideas with Human Resources (*Id*. at 102-103); and each time Coy came back to him and said that Plaintiff was to remain off work until he was released to work without restrictions, Complaint (ECF No. 1, Page ID 4-5), ¶¶ 19-20).

___

[3] Plaintiff ultimately had two more surgeries in September of 2017. Fraker Deposition, Exhibit 4, pp 26-28. The last surgery became necessary after he was "just doing some motions with the hand." *Id*. at 27. Following a second transplant, Plaintiff's hand was again completely immobilized for five weeks. *Id*. at 28. Moreover, the doctor restricted Plaintiff from, among other things, climbing trees for at least a year. *Id*. at 30.
[4] See Karcis Affidavit, Exhibit 9.

Plaintiff updated the City on his medical status by providing medical records and discussing his condition and restrictions with various City personnel.  Fraker Deposition, Exhibit 4, pp. 11-13 and 142-143.  The medical records documented continuous restriction on the use of his left hand. See generally, Medical Restriction Summary, Exhibit 2 to Coulson Affidavit (Exhibit 5). These restrictions ran from no use whatsoever to no grasping, gripping or squeezing of the left hand, to light use with no lifting over 5 pounds. *Id*. (February 24, 2017, July 5, 2017).  At Plaintiff's best point, on April 24, 2017, Dr. Little wrote:  "Patient may not work in the bucket or feed the chipper.  He may do ground level clean up." *Id.*  However, Dr. Little also noted that he was "at risk for snagging the finger because it doesn't bend yet." *Id*.

After Little's note on April 24th, Coy and Sulak considered whether Plaintiff could at least do "ground level clean-up."   Ultimately, they concluded that Plaintiff could not do those tasks safely because Dr. Little said Plaintiff could not bend his finger and was at risk for snagging and injuring it further. Coy Affidavit, Exhibit 3, Sulak Affidavit, Exhibit 11.

Then on May 8, 2017, 15 days after Dr. Little's April 24th note, Little diagnosed Plaintiff with a dysfunctional tendon.  Medical Restriction Summary, Exhibit 2 to Coulson Affidavit (Exhibit 5). Plaintiff's hand surgeon, Dr. Cullen, recommended surgery for tenolysis which unfortunately led to the discovery of the need for a tendon transplant on May 25, 2017. *Id*. Thereafter, Plaintiff was off work until June 5, 2017, and on a "no use of left hand" restriction. *Id.* (May 31, 2017).  His restriction was not revised until July 5, 2017, when it was reduced to "light use of the left hand and no lifting over 5 pounds." *Id.* (July 5, 2017).

To backtrack briefly, during April 2017, Plaintiff applied for a position as an Environmental Resource Technician. Fraker Deposition Exhibit 4, p 130.  Because his restrictions precluded him from typing, Plaintiff requested that he be allowed to take the typing test after his

restrictions were lifted and the City agreed. *Id* at 160-161.  Nonetheless, he was able to take a written test and, as a result, was invited to interview for the position in July.  *Id.,* at 161.

From June 20 to July 4, 2017, the City also posted an opening for an Arborist position. See Arborist job description posting, Exhibit 12.  Plaintiff claims that he attempted to apply for the position online on July 4th but encountered computer difficulties with the third-party website government.jobs.com.  Fraker Deposition, Exhibit 4, pp 174-177.  On July 5, 2017, Plaintiff contacted Rowena Patterson in Human Resources to inform her of the computer problem and to inquire as to how to get his application considered. *Id.*, p 174-175.  Ms. Patterson informed Plaintiff that his application was not in the system and that he would have to provide affirmative proof that he had timely applied. *Id*., at 175. Plaintiff testified that he contacted the third-party website help desk and was given instructions as to how Human Resources might proceed. *Id.,* at 176-177. He then emailed Patterson with the information he had learned and told her that she should contact the website help desk herself.  *Id.,* at 177.  See also, email string, Exhibit 13.  On July 6th, Patterson responded that the deadline would not be extended and that no other candidates had experienced problems filing their applications online.  *Id*.[5]

On June 26, 2017, in consultation with Human Resources, Joe Sulak determined that Plaintiff had failed his probation. Sulak Affidavit, Exhibit 11.  On July 6th, 2017, Sulak notified Plaintiff by phone.  *Id*.  On July 17, 2017, Plaintiff's employment officially ended.

On July 18, 2017, Plaintiff's union representative requested a step one grievance hearing. As a probationary employee, however, Plaintiff was not entitled to file a grievance under the CAB. See, Exhibit 7, Art. 12.2(b). Nonetheless, a meeting was scheduled with Ken Deering, the Director

---

[5]  In fact, the City's records show that the City had received two online applications for the ERT position on July 4, 2019 as well as many others during the application window. See Affidavit of Desiree Foster, Exhibit 14.

of Labor Relations, Plaintiff, a union representative, and Mr. Coy.  Deering Affidavit, Exhibit 9.
When Mr. Deering learned that plaintiff had been on entrance probation, Mr. Deering informed
Plaintiff that, under the CAB, he was not entitled to a grievance hearing.  *Id*.  Thereafter, no further
action was taken by the union on Plaintiff's behalf.  *Id*.

On July 21, 2017, Plaintiff was interviewed for the ERT position along with three other
candidates. Fraker Deposition Exhibit 4, p 161-162.  Plaintiff was not selected for the position. *Id*.,
p 162-163.

The City continued to pay Plaintiff's worker's compensation benefits—though without the
wage supplement—through February 23, 2019.  Karsis Affidavit, Exhibit 6.  In total, the City has
paid over $50,000 to Plaintiff.  *Id*.

On February 20, 2018, Plaintiff filed a complaint with the Equal Employment Opportunity
Commission, alleging disability discrimination. Exhibit 10.  The EEOC dismissed the claim and
issued a right to sue letter.

Plaintiff then sued the City for Failure to Accommodate under the American's with
Disabilities Act (ADA) and the Michigan Persons With Disabilities Civil Rights Act (PWDCRA);
Disability Discrimination under the ADA and the PWDCRA; and Retaliation under the ADA and
under the Michigan Worker's Disability Compensation Act.

Under Fed. R. Civ. P., p 56(a), Plaintiff's claims fail as a matter of law.  Plaintiff cannot
raise a genuine issue of material fact to prove (1) that he was a qualified person within the meaning
of the law, (2) that the City failed to reasonably accommodate him, or (3) that the City retaliated
against him based on his disability or on the exercise of his rights.  The Court should therefore
grant the City Summary Judgment on all claims.

## II.  LAW & ARGUMENT

### A.  Legal Standards – Motion for Summary Judgement

A motion for summary judgment must be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,*477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must consider the evidence and all reasonable inferences in favor of the non-moving party.  *Tysinger v Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Anderson,* 477 U.S. at 248).  "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' on which a reasonable jury could return a verdict [for Plaintiff]." *E.E.O.C. v. Ford Motor Co*., 782 F.3d 753, 760 (6th Cir. 2015). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.,* 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson,* 477 U.S. at 251-52).

### B.  Analysis of Plaintiff's Discrimination and Failure to Accommodate Claims

#### 1.  Overview of the ADA

The Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et. seq*.  states that: "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). [6]

A plaintiff who alleges a violation of the ADA has the burden of proving a *prima facie* case.  *Doe v. Univ. of Maryland Medical Sys. Corp.*, 50 F.3d 1261, 1264-1265 (4th Cir. 1995). [7] To do so, a plaintiff must show that he/she is a "qualified individual with a disability" entitled to ADA protections. 42 U.S.C. §12112(a).   The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires…." 42 U.S.C. §12111(8).[8]

If a plaintiff presents sufficient evidence that he is a "qualified individual with a disability," he must also prove that his employer "discriminated" against him within the meaning of the ADA. Once a plaintiff has made a *prima facie* case, the burden shifts to the employer to rebut plaintiff's evidence*.  St. Mary's Honor Ctr. V Hicks*, 509 U.S. 502, 506-507, 113 SCt. 2742, 125 L.Ed.2d 407 (1993).

---

[6] There is no dispute that the City of Grand Rapids is a "covered entity" under the ADA.

[7]  A *prima facie* case of disability discrimination requires Plaintiff to show that: "1) he is disabled; 2) he is otherwise qualified to perform the essential functions of his position, with or without accommodation; 3) he suffered an adverse employment action; 4) [defendant] knew or had reason to know of his disability; and 5) the position remained open or a non-disabled person replaced him." *Cotuna v. Wal-Mart Stores, Inc.,* No. 16-2519, 2017 WL 5171247, at 2-3 (6th Cir. 2017).

A *prima facie* failure to accommodate case requires Plaintiff to "show that: (1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) the employer failed to provide a reasonable accommodation. *Aldini v. Kroger Co. of Michigan*, 628 Fed.Appx 347, 350 (6th Cir.2015) citations omitted.

[8]  The Act also defines a "disability" under § 12102(2).  However, for purposes of this Motion only, the City does not challenge Plaintiff's claim that he is disabled.

2. <u>**Overview of the PWDCRA**</u>

Under MCL 37.1202(1)(a)-(e), an "employer" must refrain from taking any of a number of adverse employment actions against an individual "because of a disability… that is unrelated to the individual's ability to perform the duties or a particular job or position."

To prove a discrimination claim under this Act, "'the plaintiff must show (1) that he is [disabled] as defined in the act,[9] (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute.'" *Peden v. City of Detroit,* 470 Mich. 195, 204, 680 N.W.2d, 857 (2004). (citation omitted brackets in orig.). [10]

Further, "unrelated to the individual's ability" as used in the Act means "with or without accommodation, an individual's disability does not prevent the individual from … performing the duties of a particular job or position." M.C.L. 37.1103(l)(i).

As noted in *Peden,* 470 Mich, at 204-205:

> Thus, like the ADA, the PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that with or without accommodation, do not prevent the individual from performing the duties of a particular job. (citation omitted).

Thus, to be "qualified" under both the ADA and the PWDCRA, Plaintiff here must prove that he was able to "perform the essential functions [or duties] of a [Tree Trimmer I]" "with or

---

[9] The PWDCRA defines "disability" as "a determinable physical or mental characteristic of an individual… if the characteristic: (A)… substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position…;" or "[a] history of [such a] determinable physical or mental characteristic…;" or "being regarded as having [such a] determinable physical or mental characteristic…." M.C.L. 37.1103(d).

[10] As in the ADA, if a plaintiff proves a *prime facie* case, the burden shifts to the employers to rebut Plaintiff's evidence. *Peden*, 470 Mich at 205, citation omitted.

without reasonable accommodation." 42 U.S.C. §12111(8) and M.C.L 37.1103(1)(i).  See also,

*Ford,* 782 F.3d at 761 and *Peden,* 470 Mich at 204-205.  He cannot do so.

3.  <u>**Plaintiff is not a "qualified individual" as he could not perform the essential functions of the position of Tree Trimmer I, with or without accommodation**</u>.

a.  <u>Essential Functions</u>.

To determine the "essential functions" of an employment position, the ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

The Equal Opportunity Employment Commission (EEOC) regulations applicable to the ADA provide that the term "essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. 1630.2(n)(1).

The EEOC regulations also provide that:

Evidence of whether a particular function is essential includes, but is not limited to:

(i)     The employer's judgment as to which functions are essential;

(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)     The terms of the collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)    The current work experience of incumbents in similar jobs.

29 CFR 1630.2(n)(3).[11]

With regard to essential duties under the PWDCRA, the Court in *Peden* held that:

> … in disputes regarding what the duties of a particular job are, the employer's judgment is entitled to substantial deference.  Consistent with the plaintiff's burden of proving discrimination under the PWDCRA, the plaintiff bears the burden of presenting sufficient evidence to overcome this deference.  Unless the plaintiff can satisfy this burden, it is to be presumed that the employer's judgment concerning the duties of a particular job is reasonable.  In such circumstances, the plaintiff must prove that he can, with or without accommodation, perform those duties.

*Peden,* 470 Mich. at 219.[12]

Here, the City published a job description for the Tree Trimmer I prior to Plaintiff's application for the job. See Exhibit 1. The job description listed examples of the position's duties which included:

- removing, trimming, pruning, and topping trees, using specialized equipment and hand and power saws;
- trimming trees to assure adequate clearance for overhead utilities;
- removing split and damaged limbs from storm damages trees; removing limbs from power lines; removing trees and limbs fallen into streets and onto cars and buildings;
- planting trees, removing stumps and roots;
- Operating a variety of standard power and hand tools and specialized equipment, such as chain saws, chippers, stump cutters, mobile aerial tower, hoppers, and the like. *Id*.

Further, the job description specifies the "Requirements of Work" which include not only certain specialized knowledge components (e.g., of tree trimming practices, techniques, equipment and related safety standards) but an ability to:

---

[11] As the "Plaintiff bears the overall burden of demonstrating under the ADA that he is a 'qualified individual with a disability,' the burden of proving that a challenged function is not 'essential' lies with" him.  *Peden*, 470 Mich. at 208 (citation omitted).

[12]  While "blind deference" is not given to an employer's judgment under Federal Law, where its judgment is evidenced by words, policies, and practices as to the business necessity of a function, summary judgment is required.  *Ford*, 782 F.3d at 765-766.

- operate equipment (eg, hand and power saws, tree trimming and removal equipment and trucks) in a safe manner;
- Perform heavy manual labor (including "lifting heavy objects"); and
- Work cooperatively with other employees and the public.

*Id.*[13]

The Affidavits of Joe Sulak, (Exhibit 11) and Dan Coy, Forester and head of Plaintiff's division (Exhibit 3), makes clear that pruning, trimming, and removing trees and dangerous limbs, are, at a minimum, essential functions of the Tree Trimmer I position.[14] While the work inherent in those tasks focuses on manual labor, the position requires a great degree of skill and is not an entry level position. *Id.*[15] These functions are performed by all Tree Trimmer I employees, and have been so performed in the years preceding Plaintiff's hire and in the time frame since his departure.[16] Sulak Affidavit, Exhibit 11. As Mr. Coy makes clear that the need to perform these tasks are key to the care and maintenance of the more than 76,000 City-owned trees. Coy Affidavit, Exhibit 3.

Further, such tasks cannot, and should not for safety reasons, be performed by individuals without the full use of both hands. For example, performing pruning, trimming and tree removal require the use of a chain saw. Coy Affidavit, Exhibit 3. The American National Standard Institute

---

[13]  Possession of a valid commercial driver's license (CDL) is also a requirement. Exhibit 1.

[14] Other essential functions of the job include: clearing branches, and brush that come down from city-owned trees either naturally or through tree maintenance; assisting lead workers (Tree Trimmer II's) in higher-skill level tree removal, trimming and pruning; and, driving city-owned commercial vehicles. In order to complete these essential functions, an employee must be physical[ly] able to safely operate a rake, shovel, leaf blower, chainsaw, pole saw, pole pruner, rope and a chipper, as well as repeatedly grasp, grip, and lift materials 50 pounds and greater. Coy, Affidavit, Exhibit 3.

[15] The entry level position is Tree Trimmer Aide. Coy Affidavit, Exhibit 3.

[16] This fact is highlighted by the requirement that Tree Trimmer I's pass a performance test that includes skillfully climbing a tree and demonstrating the proper removal of a large limb. Coy Affidavit, Exhibit 3.

(ANZI) Z 133 Safety Requirements for Arboricultural Operations states the following regarding use of a chain saw:

> The operator shall operate the chain saw with the left hand and thumb gripped firmly around the forward handle and the right hand and thumb gripped firmly around the rear handle, unless it is not practicable, and the employer demonstrates that a greater hazard is posed by operating the chain saw in that particular situation.

ANZI Z133.8.7.13. [17]   The City follows this ANZI standard.  Coy Affidavit, Exhibit 3.

As noted by Dan Coy, virtually all tasks performed, and equipment used, by Tree Trimmer I's, require the full use of two hands. See Coy Affidavit, Exhibit 3.

For example, even clearing branches and brush requires full use of both hands.  The primary method for clearing this material is to feed it into a chipper. Coy Affidavit, Exhibit 3.  The ANSI STANDARD related to chippers states: "Limbs and logs, brush, and other woody material should be cut/prepared prior to feeding into the chipper."  ANSI Z133.8.7.13. The cutting of such material is done primarily with a chain saw. Coy Affidavit, Exhibit 3.  Consequently, ANZI Z133.8.7.13, governing use of chain saws, applies and the full use of two hands is required. Moreover, the majority of brush and wood that is chipped weighs 50 pounds or more, again implicating the need for full use of both hands. Coy Affidavit, Exhibit 3.[18]

Consistent with federal case law, the City's judgment as to the essential functions of a Tree Trimmer I is supported by its words, policies and actions as a business necessity.  *Ford*, 782 F.3d at 765-766.  Under Michigan Law, the City's judgment is entitled to substantial deference.  *Peden*, 407 Mich. at 219.  Moreover, the Court should presume that the City's judgement concerning those

---

[17]   As Mr. Coy relied upon ANSI Standards and other authority in his affidavits, a copy of all such authority is attached thereto.

[18]   Even dragging brush to the chipper requires two hands.  Coy Affidavit, Exhibit 3, citing Tree Care Academy Training Program.

duties is reasonable unless the Plaintiff meets "the burden of presenting sufficient evidence to overcome this deference." *Id*. Here, Plaintiff cannot meet that burden. [19]

At deposition, Plaintiff acknowledged that the Tree Trimmer I job description (Exhibit 1) listed some of the functions of the Tree Trimmer I, but questioned whether these duties constituted "essential functions."  Fraker Deposition, Exhibit 4, pp 73-75.  When asked to identify what the essential functions of the job were, Plaintiff avoided answering directly, claiming he did not "have exact knowledge of the precise list of essential functions" of the job.  *Id.,* at 75. The most he would say was that the Tree Trimmer job description *included* essential functions:

> Q:     I'm not asking you for an exact list. I'm asking you what you think the essential functions of the Tree Trimmer I job that you applied for were.
>
> A:     I agree that this list includes essential functions for the position.
>
> Q:     What are the essential functions on this list?
>
> A:     I don't know exactly.

*Id*. at 76.[20]

---

[19] This is particularly true as Plaintiff alleged in his Complaint that "Job requirements for the Tree Trimmer I position included pruning and removing trees…. Complaint (ECF No. 1, P 8). He also admitted that in the few weeks he worked as a Tree Trimmer I "it was largely pruning and removal of City trees." Fraker Deposition, Exhibit 4, p 60. He also admitted that: (1) a chain saw and a powered handsaw were the most commonly used tools. *Id*., and required the use of two hands. *Id.,* at 60-61; (2) his duties included lifting heavy objects ("heavy manual labor") *Id*., at 62 and driving commercial vehicles such as a bobcat, bucket truck (aerial access to trees), chipper and log truck, *Id*., at 63, which required a commercial driver's license (CDL), *Id*., at 64.

[20] The only "essential function" Plaintiff admitted to was "performing duties as assigned," *Id*. at 76, 77. But even then Plaintiff balked at admitting that if he were assigned to remove trees, then removing trees would be an essential function. *Id.,* at 77.  See also, *Id.,* at 78-85 (for further struggle over the concept of essential functions).  Finally when asked for any basis on which he might challenge the listed functions on the job description as essential, Plaintiff eliminated topping and use of a "hopper" but, with respect to the remaining functions,  again said: "… At present I don't have a precise delineation to give you of which of these are essential and which are not." *Id*., at

In other words, Plaintiff could not, or would not, identify the essential functions of his job. Consequently, he cannot now challenge the City's judgment as to what the essential functions were. [21]   As a result, unless Plaintiff can show that he could, with or without accommodation, perform these essential functions (e.g. pruning, trimming, removing trees, using chainsaws, power equipment, etc.)--all of which required for the use of two hands--his discrimination claims must fail. *Peden*, 470 Mich. at 216; *Ashton v. Tapco Intern. Corp*., 631 Fed. Appx. 292, 296 (6th Cir. 2015). The Plaintiff cannot make this showing.

### b.   Plaintiff could not perform the essential functions of Tree Trimmer I.

First, Plaintiff admits that, at various point throughout his recovery, his restrictions precluded performing certain tasks to varying degrees including gripping with his left hand, cutting with a chain saw, climbing trees[22] and using "quite a lot of equipment in the department . . . even a rake." Fraker Deposition, Exhibit 4, pp 52-53.  His inability to fully use two hands therefore excluded pruning, trimming, and removing trees, feeding the chipper, and lifting heavy debris. Coy Affidavit, Exhibit 3.

Although Plaintiff claims that his restrictions had eased by the end of April and that, up until his second surgery on May 25th he would have been physically able to use any equipment,

---

85. See also *Id.* at 86 ("I don't have an opinion on that."). Other than his own testimony, Plaintiff has no other evidence to challenge the list of functions on the job description as essential functions. *Id.* at 86.

[21] As noted by Judge McKeague in *E.E.O.C v. Ford*, in any event, "we do not 'allow employees to define the essential functions of their positions based solely on their personal viewpoints and experience…. And for good reason: If we did, every failure to accommodate case would go to trial because all employees who *request* their employer to exempt an essential function *think* they can work without that essential function." 782 F.3d at 764 (citation omitted) (emphasis in orig).  ]

[22] The performance test administered as part of the civil service exam for Tree Trimmer I requires applicants to demonstrate that they can skillfully climb a tree and remove a damaged branch.  Coy Affidavit, Exhibit 3.  Absent demonstration of such skill an applicant would not be eligible to work as a Tree Trimmer I.

*Id.* at 53, he remained specifically restricted by Dr. Little from using the chipper or the bucket truck during this period.  See Medical Restriction Summary, (April 24, 2017), Exhibit 2 to Coulson Affidavit (Exhibit 5).  In addition, Dr. Little wrote that, while Plaintiff could do "ground level clean-up," he was "at risk for snagging the finger because it doesn't bend yet." *Id*.

Importantly, Plaintiff forwarded Dr. Little's recommendation to the City. *Id* at 56-57. The prohibition on use of these two key pieces of equipment – and particularly the aerial bucket - meant that Plaintiff could not perform the essential functions of pruning and trimming trees (for which the bucket is routinely used) let alone feed the chipper.  Coy Affidavit, Exhibit 3.  Nonetheless, Coy and Sulak discussed having Plaintiff do ground level clean up, as suggested by Dr. Little, but determined that the risk of snagging the finger and reinjuring it precluded even this marginal task. Coy Affidavit, Exhibit 3; Sulak Affidavit, Exhibit 11.  If Plaintiff did incur another work place injury, the City arguably would face additional worker's compensation exposure.

Second, Plaintiff's medical records make clear that between the day of his injury and the day of his termination he was constantly under restrictions.  See generally, Medical Restriction Summary, Exhibit 2 to Coulson Affidavit (Exhibit 5).  These restrictions precluded Plaintiff from performing most of the Tree Trimmer I essential functions because he could not use both hands. For example, even during the period when Plaintiff was allowed light use of his hand, he still could not lift over 5 pounds.  *Id*., (March 8, 2017).  Thus, he could not perform heavy manual labor, use a chainsaw, or prune, trim or remove trees.  Coy Affidavit, Exhibit 3. [23]

---

[23]    The City's expert, Dr. Failla, reviewed Plaintiff's medical records, job description and functions. Dr. Failla concluded that from the time of Plaintiff's injury until the day of his termination, Plaintiff's injury "prevented him from performing the essential functions of Tree Trimmer I. ..." See Exhibit 15.  Plaintiff has not named any experts in this case, nor provided any written expert opinions as required in this Court's Case Management Order (ECF No. 19 Page ID 81-85). Thus, even if Plaintiff wanted to challenge Dr. Failla's opinion with medical testimony of his own, he could not do so.

Finally, even if Plaintiff testifies that he believed he could perform all essential functions of his job at certain points in his recovery, his claim must fail. "The relevant time in determining whether a plaintiff is a 'qualified individual' covered by the ADA is **at the time of discharge**." *Ashton*, 631 Fed. Appx. at 297, citing *Griffith v. Wal-Mart Stores, Inc.,* 135 F.3d 376, 380 (6th Cir. 1998) (emphasis added).

Here, Plaintiff was notified of his termination on July 6, 2017.  As of July 6th, Plaintiff admitted that he could **not** use power saws, go up in the bucket or use the chipper, remove split and damaged limbs, remove limbs from power lines, or operate standard power tools including chain saws, chippers, stump cutters, or the mobile aerial tower (bucket). *Id*., p 97-98.[24]  Thus, at the time of his discharge, Plaintiff could not perform the essential functions of a Tree Trimmer I.

Further, there was no reasonable accommodation that would allow Plaintiff to safely perform these essential functions, as they all required the full use of two hands.  Coy Affidavit, Exhibit 3.  It is not reasonable--or safe--to have a second person provide a second hand to assist Plaintiff in the use of power tools. As plaintiff could not go up in the bucket to prune or trim trees at all, let alone remove branches from overhead power lines, clearly someone else would have to do these tasks for him.  In other words, these functions would have to be eliminated in order to permit Plaintiff to continue in the role of Tree Trimmer I.

The law does not require such accommodation.  An employer is not required to eliminate essential functions from a position as an accommodation as that is *per se* unreasonable. *Ford*, 782 F.3d. at 761. For that matter, "the essential-job-function inquiry, does not require employers to lower their standards by altering a job's essential functions."  *Id*. at 764, citing 29 C.F.R § Pt.

---

[24] Plaintiff also acknowledged that, as of July 6th, he could not engage in heavy manual labor or lifting or gripping with his left hand.  Fraker Deposition, Exhibit 4, pp 99- 100.

16302(n).  See also, *Beckman v. Wal-Mart Stores, Inc.,* 2017 WL 4409097 (W.D. Mich. 2017, aff'd, 739 Fed. Appx. 800 (6th Cir. 2018) at *4 citing *Rorrer v. City of Stow,* 743 F.3d 1025, 1039 (6th Cir. 2014) and *Bratten v. SSI Servs., Inc.,* 185 F.3d 625, 632-633 (6th Cir.1999) (employer did not violate the ADA by refusing to accommodate disabled employee by having others assist him with essential duties, such as heavy lifting).

Given the record in this case, Plaintiff could not perform the essential functions of the Tree Trimmer I position, with or without accommodation, and therefore was not a "qualified person" at the time of discharge.  *Aston,* 631 Fed. Appx at 297. Consequently, there is no genuine issue of material fact on this dispositive point and the evidence is so one-sided that the City is entitled to summary judgement of Counts I, II, IV and V as a matter of law.

### 4. <u>Plaintiff's Theories of Reasonable Accommodation are untenable</u>

#### a. <u>Plaintiff was not entitled to construct his own job.</u>

As noted by Judge McKeague in *E.E.O.C. v. Ford*, 782 F.3d at 757, while the ADA "requires employers to reasonably accommodate their disabled employees; it does **not endow all disabled persons with a job** – or job schedule – **of their own choosing**." *Id.* at 757 (emphasis added).  Moreover, "[t]he *employee* bears the burden of proposing an accommodation that will permit [him] to **effectively perform the essential functions of [his] job.**" (italics in original; other emphasis added).

Here, Plaintiff never proposed a specific accommodation that would permit him to effectively perform the essential functions of his Tree Trimmer I job.[25]  Instead, Plaintiff claims

---

[25] The City had a specific form for requesting accommodation, but Plaintiff did not use it.  See Exhibit 3 to Coulson Affidavit, (Exhibit 5).  Other than providing his medical updates which contained his restrictions, Plaintiff made no written request to the City.  Fraker Deposition, Exhibit 4, pp 102-103.  Rather, he relies on conversations he had with Dan Coy as to other tasks he might perform.  *Id*., pp 113-115.

that he should have been permitted to simply perform some of the marginal tasks associated with the position such as serving as a spotter (Fraker Deposition, Exhibit 4, p 95), or tasks associated with other positions in the Parks Department such as spraying and injecting trees (*Id.* at 104).[26]

Alternatively, Plaintiff claims that the City was required to essentially cobble together tasks he could do such as answering phones (*Id.* at 207-208) or inputting data into a computer data base known as GIS (*Id.* at 104-105),[27] or allowing him to train volunteers at a one day tree planting event on Arbor Day. *Id.* at 105-106.[28]

The City, however, was not legally required to lower its standards by altering the essential functions of a Tree Trimmer I. *Ford*, 782 F.3d at 764. Nor was it required to create a job of Plaintiff's own choosing.  *Id.* at 757.[29] See also, *Trout v. Electronic Data Systems Corp.*, 151 Fed. Appx. 390, 399 (6th Cir. 2005) (employee "entitled only to a reasonable and effective accommodation, not necessarily to the accommodation of her choosing.").  Consequently, this theory of reasonable accommodation fails.

---

[26]  Serving as a flagman is rarely a function of the Tree Trimmer I job, as traffic is generally redirected by barriers.  Coy Affidavit, Exhibit 3.  Spraying and injecting trees are roles of the Arborist position which is classified as 16A, four levels above the 12A Tree Trimmer I position. Compare, Arborist job description, (Exhibit 12) with Tree Trimmers Job description (Exhibit 1). Moreover, spraying and injecting trees requires the full use of both hands. Coy Affidavit, Exhibit 3.

[27]  As Plaintiff admits that, with the exception of the late April through early May period, he was unable to type until at least July 5 (Fraker Deposition, Exhibit 4, p 119) – and in fact requested that the City defer a required typing test  for the ERT position (which the City did do) – it is difficult to see how he could effectively perform data entry on a routine basis.

[28]  Answering phones and inputting data into the CIS were never functions of the Tree Trimmer I position.  Coy Affidavit, Exhibit 3.

[29]  This is equally true under the PWDCRA.  "An employer likewise has no duty to accommodate the plaintiff by recreating the position, adjusting or modifying job duties otherwise required by the job description, or placing the plaintiff in another position." *Kerns v Dura Mechanical Components, Inc*., 242 Mich. App. 1, 16, 618 N.W.2d 56, 64 (2000).

b. Plaintiff's applications for promotion do not constitute a request for reasonable accommodations.

1. Plaintiff was not eligible for a transfer into the ERT or Arborist position.

The City acknowledges that transfer of an employee to a vacant portion may be reasonable under the ADA. Plaintiff, however, did not specifically request a transfer to a different job as an accommodation.[30] Nonetheless, while on medical leave, he did apply for an Environmental Resources Technician (ERT) position, and attempted to apply for an Arborist position.[31] Plaintiff admitted in deposition that he is not now complaining about his treatment with respect to the ERT position. Fraker Dep, Exhibit 4, p190. In any event, neither position would constitute a reasonable accommodation, such that the City was obligated to place Plaintiff in either role.

First, the statutory Civil Service rules provide:

405.1 Transfer – A position may be filled by transferring an employee from a position of **the same classification** or **similar classification** with essentially the same basic qualifications and the same maximum salary. (Emphasis added).

Tree Trimmer I is classified as 12A with a maximum salary of $ 47,777.00. Exhibit 1. The ERT position is classified as 18A with a maximum salary of $58,096.00. Exhibit 16. The Arborist position is classified 16A with a maximum salary of $54,306. See Exhibit 12. Thus, a transfer was not permitted under the Civil Service rules.

---

[30] "An employee who wants a transfer to another job as an accommodation must ask for a transfer" *Beckman v. Wal-Mart Stores, Inc.*, 739 Fed. Appx. 800, 804 (6th Cir. 2018).
[31] With respect to his failure to accommodate claims, plaintiff alleged only that "Defendant could have accommodated Plaintiff without undue hardship." See Complaint (ECF No. 1, Page ID. 10-15) ¶¶ 40, 68. It is therefore unclear whether he includes the ERT or the Arborist position in these allegations. Notably, his EEOC complaint makes no allegation regarding the ERT position (Exhibit 13) and Plaintiff admits as much. Fraker Deposition Exhibit 4, pp 189-190. Further, Plaintiff's claims for discrimination in the hiring/application process apparently relate only to the Arborist as that is the only position that he applied for in July. See, Complaint (ECF No. 1, Page ID 86), ¶30 and EEOC charge, Exhibit 13.

Second, the CAB requires that these positions be awarded based on seniority.  The CAB provides that "[s]eniority shall apply to . . . promotions and transfers . . . "  CAB Exhibit 7, Art. 12, Section 5.  Further, "[v]acancies in the bargaining unit labor class which do not involve a natural progression series shall be filled on the basis of seniority **by employees who have completed their entrance probation period** . . ." according to a set order of priority.  *Id.*, Art. 12, Section 5a emphasis added).  As Plaintiff had not completed his entrance probation period, he was not eligible for "promotion or transfer" to these positions.[32]

Third, both job descriptions cautioned that: "PERMANENT CITY EMPLOYEES WILL HAVE PREFERENCE IN THE HIRING PROCESS." Exhibits 12 and 16. Plaintiff was a probationary employee in a permanent position, but until the expiration of his probationary period, he was not a permanent employee. See CSR, Exhibit 8, 406.1.  Moreover, any employee with had already passed their six month entrance probation, would necessarily have had seniority over Plaintiff.  Thus, placing Plaintiff in either the ERT or Arborist position in preference to a more senior permanent employee would violate the City's seniority system and was therefore not a reasonable accommodation.  *U.S. Airways v. Barnett*, 535 U.S. 391, 394, 122 S.Ct. 1516, 152 L.ed.2d 589 (2002).

Nor, as discussed below, is there evidence from which a reasonable jury could conclude that the City discriminated against Plaintiff based on disability in its actions regarding the Arborist position.[33]

---

[32]    The priority provisions of Art. 12 Section 5a permit consideration of an applicant "outside City employment" only if no employees with seniority file the vacancy.  See CAB, Art. 22 Section 5a(5).  Plaintiff was considered for the ERT position on this basis.

[33]    As noted, Plaintiff admits he has no complaint as to the ERT position. Fraker Deposition, Exhibit 4, p190

2.   Plaintiff failed to properly apply for Arborist portion.

As background, it is worth noting that Plaintiff always intended to look for opportunities for promotion, regardless of his injury. Fraker Deposition, Exhibit 4, p 126. He followed website postings for the City online,[34] and through paper postings in the workplace. *Id.* at 127. In April, he applied for the ERT position online, as he had for the Tree Trimmer I job. *Id.* at 127, 130.

From June 20, 2017, to July 4, 2017, the City posted an opening for an Arborist. Exhibit 12.  Plaintiff learned of the position "at least a couple days" before the posting closed. Fraker Deposition, Exhibit 4, p. 166.  Nonetheless, he waited until the last day to apply on-line. *Id*. at 167.[35]  Plaintiff alleges that he experienced technical difficulties with the website that prevented his application from going through.  *Id.,* at 166-169. After midnight on July 5th, Plaintiff emailed Rowena Paterson, in Human Resources, to advise of the problem. *Id.,* at 160.   Later on July 5th, Plaintiff spoke to Patterson to ask what "next steps" could be taken to have his application considered.  *Id.,* at 173.  Ms. Patterson confirmed that his application was not in the system, *Id*. and, according to Plaintiff, advised him that he would have to provide proof that he had submitted an application in a timely fashion. *Id* at 175. Plaintiff later sent Patterson an email claiming that the application website help desk had told him the problem was widespread and that HR departments were either extending their application deadline by one day or manually entering the applications. See email string, Exhibit 13. Plaintiff did not provide an email or confirmation from

---

[34]  At all times relevant to this case, the City posted its vacant positions online at http://www.governmentjobs.com/careers/grandrapids.

[35] While Plaintiff claims he applied on July4th, there is no record of his application at that time, though the City did receive timely applications online from other candidates, including on July 4th. See Foster Affidavit, Exhibit 14.

the website of this advice,[36] but instead only suggested that Patterson contact them herself by phone.  *Id*.  On July 6th, Patterson informed Plaintiff that no one else had reported problems applying online and that the deadline would not be extended. Fraker Deposition, Exhibit 4, at 189. See also, email string, Exhibit 13.

The record makes clear that Plaintiff's issue here has nothing to do with his "disability." He does not allege that he needed more time to apply due to his injured hand. He alleges that he had technical difficulties. Further, Plaintiff chose not to provide proof that he had timely applied for the job as Patterson requested, but instead chose to put the burden of acquiring that proof back on her. Other than inadmissible hearsay, Plaintiff has no evidence that there *was* a glitch in the system.  Fraker Deposition, Exhibit 4, pp 167-168.  In fact, the City did receive timely applications online from other candidates, including on July 4, 2017.  Foster Affidavit, Exhibit14.

As a general practice, the City does not extend application windows for *any* individual who misses the deadline because to do so would require the City to reopen the position publicly for everyone.  *Id*. Thus, while the City did not allow Plaintiff to apply for the Arborist position <u>after</u> the application period closed, Plaintiff was allowed (but failed) to apply for this position while it was posted, and the City's decision not to reopen the posting was a matter of standard practice unrelated to Plaintiff's alleged disability. For these additional reasons, Counts I and V should be dismissed.

### 5  <u>Medical leave together with supplementary compensation constituted a reasonable accommodation</u>

---

[36] Plaintiff admits he also has no information from his own computer -such as a copy of any error message or screen shot showing when he attempted to send his application – to back up his claim. Fraker Deposition, Exhibit 4, pp 167-168.

Beyond, the fatal weaknesses in Plaintiff's case as described above, Plaintiff's claims should fail because the City did reasonably accommodate Plaintiff's injury.  It granted him medical leave and, in addition to his Workers Compensation benefits, paid him a wage supplement throughout his 20 weeks of leave.  Karsis Affidavit Exhibit 6.  Under the case law, even *unpaid* leave may constitute a reasonable accommodation.  *Bolden v Lowes Home Centers*, *LLC*, 783 Fed. Appx. 589 (6th Cir. 2019), citations omitted. The circumstances here warrant the same conclusion.

First, Plaintiff was on continuous restrictions that precluded performing the essential functions of his job.  Indeed, Plaintiff's surgeon, Dr. Cullen directed that "if the employer is unable to accommodate the restrictions listed, it is the responsibility of the employer to place the employee off work."  Medical Restrictions Summary, Exhibit 2 to Coulson Affidavit (Exhibit 5). That is exactly what the City did.

Second, the fact that Plaintiff wanted to do marginal tasks, or tasks cobbled together from other positions, such as answering phones, does not render medical leave unreasonable under the law.  For example, in *Bolden*, Plaintiff complained that his employer, Lowe's, "did not accommodate him after he reinjured his ankle because it placed him on leave instead of reassigning him to a different job." *Bolden,* 783 Fed. Appx., at 599.  Plaintiff argued that Lowe's "should have kept him working as a phone operator or in the office instead of placing him on unpaid leave." *Id.*, at 600.  The Court disagreed noting that Plaintiff did, "not offer any evidence other than his opinion that there were full-time jobs as a phone operator, or that there were openings for those positions at the time he needed sedentary work." *Id.*  Under these circumstances the Court in *Bolden* agreed that Plaintiff had failed to make a *prima facie* case of failure to accommodate under the ADA. *Id*. Leave was therefore reasonable.

The same is true here.  Plaintiff offered no evidence of any "full-time job" that he could do with his restrictions.  He focused solely on *isolated tasks*, he thought he could perform, not actual vacant positions.  Moreover, other than his own opinion, Plaintiff has no admissible evidence that even those *tasks* were available during his recovery.

As stated in *Trout*, 151 Fed. Appx. at 399 an employee is:

> entitled only to a reasonable and effective accommodation, not necessarily to the accommodation of her choosing. See *Hankins v. The Gap, Inc*., 84 F.3d 797, 800-01 (6th Cir.1996). "[A]n employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Id*., citing *Ansonia Bd. Of Educ. v. Philbrook*, 479 U.S. 60, 68-69; 107 S.Ct. 367; 93 L.Ed.2d 305 (1986).

Here, medical leave plus supplementary pay kept Plaintiff essentially whole financially during his entire medical leave and avoided the risks of reinjury to him. It also avoided the need to eliminate essential functions, or to cobble together tasks (which the City was not legally obligated to do).  Medical leave also complied with Plaintiff's surgeon's direction to place Plaintiff off work if the City could not accommodate his restrictions. In these circumstances, the Court should find that the City's actions constituted a reasonable accommodation and that Plaintiff was not entitled to more.

**C. Analysis of Plaintiff's Retaliation Claims**

Plaintiff's complaint alleges retaliation under the ADA (Count III) and under the Michigan Worker's Disability Compensation Act, M.C.L. 418.301(11) *et. seq*. (Count VI). Neither claim presents a genuine issue of material fact that would save Plaintiff from summary judgment.

**1.  Retaliation under the ADA**

For an ADA retaliation claim, Plaintiff must prove that (1) he engaged in an activity protected by the ADA; (2) the City knew he exercised his protected right; (3) the City took an adverse employment action against him or subjected him to severe or pervasive retaliatory

harassment; and (4) there was a causal connection between his protected activity  and the City's action. *Aldini v. Kroger Co. of Michigan,* 628 Fed. Appx. 347, 352 (6th Cir. 2015), citations omitted. [37] "Discrimination here means retaliation – that 'but for' an employee's statutorily protected activity the employer would not have taken the 'adverse employment action.'" *Ford*, 782 F.3d at 767, (citations omitted).  In other words, to establish a prima facie Plaintiff must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer. *Ford,* 782 F.3d at 770, citing, *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 362, 133 S.Ct 2517, 186 L.Ed.2d 503 (2013). [38]

Here, Plaintiff claims that his protected activities included providing his medical information to the City and requesting that he be brought back to work. Fraker Deposition, Exhibit 4, p 209.  For purposes of this Motion, the City does not challenge that these activities were protected.  Rather, the claim must fail as Plaintiff cannot establish that these activities were the but-for cause of the adverse actions about which Plaintiff now complains.

In his discovery responses, Plaintiff alleged generally that three actions were adverse:  (1) Rowena Patterson's refusal to  allow him to apply for the Arborist position after the deadline closed and her general treatment of him during their interactions; (2) Joe Sulak's call terminating his employment which Plaintiff claims came "14 minutes after [Patterson] officially den[ied] him his legal right to be considered for the Arborist position:" and (3) the placement of a "bogus"

---

[37] While the City does not concede that Plaintiff meets the first three prongs of this test, for summary disposition purposes, the City concentrates on the causal connection required by the fourth prong.

[38] If Plaintiff makes a *prima facie* showing, the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for the employment action. [cite] Thereafter the Plaintiff must show that the Defendant's proffered reason was pretextual in that it (1) has no basis in fact, (2) did not actually Defendant's action, or (3) was insufficient to motivate Defendant's action.  *Harris v. Metro. Gov't of Nashville & Davidson Cnty,*594 F.3d 476, 486 (6th Cir.2010), citation omitted.

performance evaluation in his employment file. Plaintiff's Answers to Defendant's First Set of Discovery Requests, Exhibit 17, (See Nos. 17, 18 and 7).  All of these fail for want of a casual connection.

a.  Rowena Patterson's refusal to allow Plaintiff's application for Arborist after the application window closed.

"An act or omission is not regarded as the cause of an event if the particular event would have occurred without it." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owens, Prosser and Keeton on Law of Torts 265 (5th ed.1984).

As discussed above, the City does not extend application deadlines for someone who simply misses the deadline to apply. Foster Affidavit, Exhibit 14.  To do so would require reopening the posting publicly. *Id*.

Here, Plaintiff - who did not claim he needed an accommodation in order to apply--simply missed the deadline. Nonetheless, Ms. Patterson, indicated a willingness to consider his late application if he could provide affirmative proof to her that a computer glitch caused his problem. He did not provide any proof. Rather, he asked her to get the proof herself. She was not under any obligation to do so, nor was he under any restriction or disability that would prevent him from getting a simple email or other documentation from his contact at the website to verify his claim. As it was, other candidates had successfully submitted applications on July 4th. Foster Affidavit, Exhibit 14.  Under these circumstances, a reasonable jury could not conclude that but-for his disability (or the exercise of his civil rights), plaintiff would have been considered for the Arborist position after the application window closed.  To the contrary, he would not have been considered because his application was late.

His retaliation claim in this regard is not saved by his meetings with Ms. Patterson. While he may have considered her comments rude or even intrusive, such meetings do not give rise to a viable claim "simply because they cause the employee distress." See, e.g., *E.E.O.C. v. Ford*, at 768 citation omitted.[39]  Further, Patterson's comments (regarding his home life, etc.), do not show that but-for Plaintiff's protected activity, the City would have accepted his late application.  To the contrary the decision not to accept late applications was the City's standard practice (Foster Affidavit, Exhibit 14) and it was *Patterson* who offered Plaintiff the chance to gain an exception from that standard practice, if he provided proof of the computer glitch.  He chose not to do so. Finally, it was Patterson who gave Plaintiff a pass on the typing test for the ERT position and invited him for an interview, demonstrating her willingness to accommodate him in the past. Again, no reasonable jury could find, under these circumstances, that but-for Plaintiff's disability (or the exercise of protected rights), plaintiff would have been considered for the Arborist position after the application window closed.

b. Joe Sulak's call terminating Plaintiff's employment

Plaintiff claims that the temporal proximity between Patterson's refusal to allow his late application for Arborist and Joe Sulak's call to terminate him – allegedly 14 minutes later – substantiates a causal relation between his protected activity of applying for the Arborist job and his termination. That argument fails here.

"Temporal proximity between an assertion of …rights and a materially adverse action is sufficient to establish the causal connection of a retaliation claim '[w]here an adverse employment action occurs *very close* in time **after an employer learns of a protected activity.**'" *Linsay v.*

---

[39] The City acknowledges that the Court in *Ford* was discussing the behavior of Ford's employee in the context of a pretext analysis, but the authority cited is appropriate as retaliation was the overarching claim under consideration.  *Ford*, at 767-768.

*Yates,* 578 F.3d 407, 418-19 (6th Cir. 2009) (citation omitted; italics in original; bold emphasis added).

Here, Joe Sulak did not learn of Plaintiff's protected activity at all.  Sulak did not communicate with Ms. Patterson about Plaintiff's Arborist application or about Plaintiff's termination on July 6th or at any time. Sulak Affidavit, Exhibit 11.[40] Mr. Sulak did not even know that Plaintiff was attempting to apply for the Arborist job. *Id.* Consequently, there is no evidence to suggest a causal connection between the two events.

Further, the decision to terminate Plaintiff actually *preceded* Plaintiff's attempt to apply for the Arborist position.  Plaintiff claims his application efforts took place on July 4th.  Joe Sulak makes clear that the decision to terminate Plaintiff occurred on June 26, 2017.  Sulak Affidavit, Exhibit 11.  Thus no reasonable jury could conclude that but-for Plaintiff's efforts to apply for the Arborist position (his protected activity), his termination would not have occurred.

c. The "bogus" performance evaluation

Plaintiff complains that after his termination, the City placed a "bogus" performance evaluation in his file. See, Plaintiff's Answers to Defendant's Discovery Requests, Exhibit 17 (No. 7).  The evaluation was sent in by Dan Coy at the request of Joe Sulak. Sulak Affidavit, Exhibit 11. While Plaintiff did not have an evaluation prior to his termination,[41] it is City policy to evaluate an employee when his/her probation ends probation, even when it ends unsuccessfully.  *Id*.

In pertinent part, Coy's evaluation reads:

Overall David shows a basic knowledge and understanding of his body of work. However, his attitude towards his fellow teammates comes across as on [sic] of

---

[40] Ms. Patterson herself, was not present at the June 26th meeting. Sulak Affidavit, Exhibit 11. Nor was she a decisionmaker with respect to the termination of any employee. Foster Affidavit, Exhibit14.

[41] A probationary employee typically has an evaluation after 3 months of service. Here, Plaintiff had not completed 3 months of service as he had been off work after his first month on the job.

> superiority. While he listens to others he does not change his actions in light of what they have told him even when given specific instructions by crew leaders. Also he does not readily participate in completing low level tasks such as raking that are typically done by people in his position. This issue was brought up to him on several occasions including by management, but was not resolved during his time working here.

Evaluation, Exhibit A to Affidavit of Dan Coy, Exhibit 3.  Essentially, the evaluation comports with Mr. Callendar's testimony in his Affidavit, Exhibit 2, and with Mr. Coy's testimony as to the overall reports he received in his supervisory capacity. See Coy Affidavit, Exhibit 3. While Plaintiff may disagree with Coy's comments, and even be distressed by them, he cannot establish that the evaluation is "bogus."  Moreover, other than his own speculation, he cannot show that but-for his protected activity (ie providing medical records and requesting to come back to work) this evaluation would not have been placed in his file. As it reflected the only performance he undertook for the City, the evaluation was appropriate as documentation of Plaintiff's efforts.

## 2. <u>Retaliation Under the WDCA</u>.

Plaintiff also filed a claim for retaliation under the WDCA alleging that "Defendant discriminated against and terminated Plaintiff in retaliation for invoking his rights under the Act. Complaint (ECF No. 1, PageID.18) ¶ 76.

Under MCL 418.301(13), an employer may not discharge an employee "because of the exercise by the employee … of a right afforded by this act." To establish a *prima facie* of retaliation under the WDCA, the employee must present evidence that shows that the employer took an adverse employment action and that such action was causally connected to the employee's assertion of a right under the Act. *Cuddington v. United Health Servs.,* 298 Mich.App 264, 275; 826 N.W.2d 519 (2012).

The act does not define the term "right." Nor does Plaintiff identify in his Complaint what rights he exercised under the Act.  In his deposition, however, he referred to giving notice of his

medical condition and his repeated attempts to return to work. Fraker Deposition, Exhibit 4, p207.

Plaintiff acknowledged that his evidence of retaliation under the WDCA and under the ADA are

"mixed" such that he "[does not] have anything specific to worker's comp … [as] that was just

one of the pieces in the mix –" *Id.* p 206. Stated differently, Plaintiff thinks his retaliation claim

under the Worker's Compensation Act and under the ADA are "different aspects [that] are

related," and referred to his discovery responses.  *Id*.[42]

As Plaintiff ties his evidence of retaliation under the WDCA together with that under the

ADA, his claim here must fail for the same reasons. As discussed above, Plaintiff cannot establish

the requisite but-for connection between any protected act and any adverse employment action.

Even the addition of the filing of a worker's compensation claim does not change the calculus.

Other than his own speculation, Plaintiff has no evidence to show that but-for the filing of that

claim, the City would not have failed him on his probation. Speculation is not enough. See e.g.

*West v. Gen. Motors Corp.,* 469 Mich. 177, 186; 665 N.W.2d 468 (2003); *Sniecinski v. Blue Cross*

*& Blue Shield of Mich.,* 469 Mich. 124, 140; 666 NW2d 186 (2003).  This claim too must fail.

Respectfully submitted,

Date:  March 10, 2020                      By: */s/  Elizabeth J. Fossel*
                                              Elizabeth J. Fossel (41430)
                                              Toby Koenig (P72367)
                                          Business Address & Telephone:
                                              300 Monroe Avenue, N.W.
                                              Suite 620
                                              Grand Rapids, MI  49503
                                              (616) 456-4000

---

[42] Those responses, Exhibit 17, only refer to the discrete actions discussed above: refusal to consider him for the Arborist position, terminating his employment allegedly 14 minutes after Patterson refused to extend the deadline for the arborist position, and putting "bogus" evaluations in his file after the termination. See Plaintiff's Answers to Defendant's First Set of Discovery, p 11.

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the above brief contains 10,490 words, excluding portions exempted by L.R. 7.2(b)(i). This document was prepared using Microsoft Word, Office 365, which was used to calculate the word count.

Dated:  March 10, 2020

By:   */s/ Elizabeth J. Fossel*
      **ELIZABETH J. FOSSEL (P41430)**
      Director of Civil Litigation
      Attorney for Defendants

## **CERTIFICATE OF SERVICE**

Joanne V. Steele, Legal Secretary for the City of Grand Rapids, hereby states that on March 10, 2020, she served a true and complete copy of Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) on Plaintiff, via United States first class mail with postage fully prepaid, upon:

> **DAVID FRAKER**
> **3032 Bird Ave., NE**
> **Grand Rapids, MI  49525**

Dated:  March 10, 2020                    */s/ Joanne V. Steele*
                                                              Joanne V. Steele